Brenda D. GUMBS, Plaintiff,

v.

Brian HALL, Donald J. Sheehan, Thomson Information Services, Inc., a/k/a Thomson Legal Publishing, Inc., a/k/a Lawyers Cooperative Publishing, West Publishing Corporation, Defendants.

No. 97–CV–6370L.

United States District Court, W.D. New York.

June 1, 1999.

Thomas S. Gill, Saperston & Day, P.C., Buffalo, NY, for Brenda D. Gumbs.

Gerald L. Paley, Rochester, NY, James F. Coster, Satterlee, Stephens, Burke & Burke, LLP, New York City, James F. Rittinger, Satterlee, Stephens, Burke & Burke, LLP, New York City, for Brian Hall, Donald J. Sheehan, West Publishing Corporation.

Gerald L. Paley, Rochester, NY, James F. Rittinger, Satterlee, Stephens, Burke & Burke, LLP, New York City, for Thomson Information Services, Inc.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, Brenda D. Gumbs, commenced this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Gumbs alleges that defendants discriminated against her on account of her race and sex in certain matters pertaining to her employment. Defendants have moved for summary judgment. For the reasons that follow, defendants' motion is granted.

## BACKGROUND

Plaintiff, a black female, began working for defendant Lawyers Cooperative Publishing ("LCP") in September 1993 as Senior Vice President, Human Resources. At the time, LCP was one of three legal publishing companies owned by defendant Thomson Legal Publishing Inc. ("TLP"), the other two being Clark Boardman Callaghan and Bancroft–Whitney. When plaintiff was hired, each of these three companies was operating as a separate unit, with its own human resources depart-

ment. LCP was the largest of the three, with about 1000 employees and annual gross sales of $166 million.

In January 1995, TLP hired defendant Brian Hall as its President and Chief Executive Officer. He soon decided to combine all of TLP's legal publishing companies into a single unit. One result of this decision was that there would be only one human resources department for all the legal publishing companies, and therefore a single Vice President of Human Resources position. The new Vice President would oversee all of TLP's legal publishing human resources functions, and would report directly to Hall.

Hall asked several people at TLP for advice concerning filling the new position. One of them, Kathryn Downing, the then-President of LCP, testified at her deposition that she "highly recommended [Gumbs] to him. . . . " Affirmation of Thomas S. Gill (Item 39), Ex. A at 9. Downing, who left LCP in September 1995, testified that she spoke to Hall about Gumbs on more than one occasion that summer, and that Hall indicated that, based on the opinions of some other people within TLP, he had some reservations about selecting Gumbs for the position, although Downing stated that at the time she resigned, she had the impression from what Hall had said to her that he did intend to interview Gumbs for the position. *Id.* at 10–11.

Hall states that he also asked Anthony Vasile, who was the Chief Financial Officer ("CFO") of LCP and who had also worked with plaintiff, for his opinion about her capabilities. Vasile allegedly told Hall that although Gumbs had performed well at LCP, he did not think she had the experience to handle the new position, particularly since by that time, the late Summer of 1995, it was known that TLP was acquiring West Publishing Company ("West"), which then had 7500 employees and annual sales of around $800 million. Hall Affidavit (Item 31) ¶¶ 2, 4; Vasile Affidavit (Item 35) ¶ 4. The new Vice President, then, would have responsibility for human resources functions covering a far greater number of employees than plaintiff had dealt with at LCP.

Hall also sought the advice of Steven Mower, who was the Vice President of Human Resources for Thomson Professional Publishing, an entity to which TLP then reported. Hall asked Mower for his opinion of four persons, including plaintiff, all of whom were human resources managers within TLP. Mower states that he had been involved in the hiring of plaintiff, and had worked with her on a number of occasions since then. Mower sent Hall an e-mail message that was critical of Gumbs, saying that "she seemed very unsure of herself," that she had "dropped the ball big time" with respect to a number of matters, that she had "a total lack of credibility outside of LCP," and that "[s]he [wa]s not seen as a team player by any definition." Mower Affidavit (Item 34) Ex. A. Mower told Hall, "I don't think you have the horses to pick from inside," and that "it would be a mistake" to do so. *Id.* Mower did identify another one of the four persons addressed in the message as "the one I would recommend if you are determined to select from inside," but clearly he believed that it would be wiser to look for a candidate from outside TLP. *Id.*

Hall then directed Vasile to begin a search for external candidates. Vasile engaged the services of an outside agent, defendant Donald Sheehan, a professional executive search consultant. Sheehan's contract with TLP provided that he would receive $10,000 at the outset of his search, and an additional $10,000 if TLP hired one of the candidates located by Sheehan. Vasile Affidavit Ex. A. Plaintiff does not dispute that Sheehan was specifically instructed only to search for external candidates. Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ¶ 1.

Among the candidates identified by Sheehan was James Greenawalt, a white male. Greenawalt had previously been the

Corporate Vice President, Human Resources for Bausch & Lomb, Inc. ("B & L"), which at the time was approximately a $2 billion company with some 14,000 employees. In that capacity, Greenawalt had had overall responsibility for the worldwide human resources functions of B & L.

Hall was apparently impressed by Greenawalt's credentials, for he eventually offered him the position. Hall did interview plaintiff on October 10, 1995, but she alleges that this meeting was a sham, as Hall had already made the decision to hire Greenawalt. Plaintiff claims that Hall simply wanted to give the appearance of considering her for the job in order to avoid a discrimination charge.

At any rate, Hall met again with plaintiff on October 12, 1995, and informed her that he had decided to offer the position to Greenawalt. Plaintiff's immediate reaction was to accuse Hall of discrimination, which he vehemently denied. Hall told plaintiff that he did not view his hiring of Greenawalt as a vote of no-confidence in plaintiff. Hall told plaintiff that he hoped she would remain at TLP, and she agreed at least to stay on for a few months.

Greenawalt began working at TLP in October 1995. In Spring 1996, TLP's West acquisition agreement had been signed. TLP then combined all its legal publishing operations into a unit known as West Group. West Group was in turn divided into two units, Publishing Operations (responsible for editorial work) and "Market Center Operations" (responsible for sales and marketing). Both of these two units were to have their own Vice President of Human Resources, who would report to Greenawalt.

Greenawalt offered plaintiff her choice of the two new positions, but she turned both of them down. Plaintiff states that she viewed both of them as lower-level positions than her LCP position because in those new positions, she would be reporting to Greenawalt, who in turn reported to Hall, whereas previously she had reported directly to Hall.

Defendants state that the Publishing Operations unit encompassed about 1500 employees, making it larger than LCP had been during plaintiff's tenure there, and that both positions carried greater responsibility than plaintiff's former human resource position at LCP, because both units had more product lines and more physical locations than LCP alone did. Defendants also state that plaintiff would have received the same salary as she had at LCP—$137,800—plus an annual bonus of up to 40%, compared to 36% previously. Plaintiff claims that at the time Greenawalt offered her the positions, the exact scope of these units' size and operations had not been determined, and that Greenawalt did not tell her what her salary would be.

Defendants allege that Greenawalt made other efforts to keep plaintiff at TLP, and all these allegations are admitted by plaintiff. After plaintiff declined the two new human resource positions, Greenawalt offered her still another position, entitled Vice President of Organizational Development. Although the position was not clearly defined at that time, Greenawalt offered plaintiff the opportunity to help define the position if she were interested in accepting it, but she declined, stating that the position was too far removed from the business side of TLP.

In a final effort to retain plaintiff, Greenawalt in effect told her, "[T]ell me what it would take to keep you." Greenawalt Affidavit (Item 32) ¶ 8. Plaintiff admits this fact. *See* Defendants' Statement of Undisputed Material Facts ¶ 76; Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ¶ 1. Plaintiff responded that it was too late to find a place for her at TLP. She admitted at her deposition that by that point she had simply decided to leave, and was not going to wait to find out the details of any new positions that were offered to her. James F. Rittinger Affidavit (Item 36) Ex. H at 241. Plaintiff resigned effective June 30,

1996. She eventually accepted a job offer elsewhere.

At the time of her resignation, plaintiff submitted a proposed severance package to TLP. This was based on her employment agreement, which provided that she would be entitled to severance payments if her employment was "terminated for any reason other than cause. . . ." Rittinger Affidavit Ex. B. Plaintiff requested a lump-sum, tax-free payment of $344,500 (which would obviously have cost TLP more than that, since TLP would in effect be paying plaintiff's taxes for her), plus several other benefits totaling in the tens of thousands of dollars. Greenawalt Affidavit Ex. A.

Greenawalt responded by offering plaintiff a "package in lieu of severance or any other company benefits," on condition that she "acknowledg[e] that such benefits are more valuable than the benefits to which [she] would otherwise be entitled . . .," and release TLP from all liability from any claims that she might have had against them. *Id.* Ex. B. The offer included six months' compensation (and as much as twelve if plaintiff were unable to secure employment despite her best efforts to do so), and a number of other benefits.

By letter from her attorney, plaintiff refused Greenawalt's offer, stating that plaintiff believed she had been discriminated against, and that if TLP would not offer an "appropriate settlement," plaintiff would sue. *Id.* Ex. C. Plaintiff commenced this suit on August 26, 1997.

The amended complaint names as defendants Hall, Sheehan, and several corporate defendants, though the parties have since stipulated that West Publishing Corporation is the corporate defendant in this action. The first cause of action alleges race and sex discrimination in violation of Title VII. The second cause of action asserts a parallel claim under the New York State Human Rights Law ("HRL"), Exec. L. § 296. The third cause of action, asserted against Hall and West Publishing Corporation, alleges a breach of plaintiff's employ-ment contract in connection with the severance issue.

## DISCUSSION

The method of analysis of a race or sex discrimination claim under Title VII is by now well-established. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, at 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

New York courts also require the same standard of proof for claims brought under § 296 of the HRL as for those brought under Title VII. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995). Plaintiff's Title VII and HRL claims may therefore be analyzed in tandem. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998).

A Title VII plaintiff makes out a prima facie case by showing membership in a protected class, qualification for the position, an adverse employment action, and the ultimate filling of the position by a person not of the protected class. *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). For purposes of their summary judgment motion, defendants do not dispute that plaintiff has made out a prima facie case. The issue here is whether plaintiff has adduced sufficient evidence to create an issue of

fact about whether defendants' proffered reason for their decision to offer the position in question to Greenawalt rather than plaintiff—*i.e.*, that he was better qualified—is a pretext for race or sex discrimination. I find that she has failed to do so.

In opposition, plaintiff relies on little more than the evidence that she has presented to establish her prima facie case: that she is a black female, and that Hall, a white male, chose another white male for the Vice President position. That is not enough, however, absent evidence suggestive of race or sex discrimination. *See Dinolfo v. Rochester Telephone Corp.*, 972 F.Supp. 718, 726 (W.D.N.Y.1997) ("As the Second Circuit recently made clear ... the fact that plaintiff may have made out a prima facie case is not necessarily enough for her to prevail on her claim") (citing *Fisher*, 114 F.3d at 1337).

■ The fact that Greenawalt is a white male is insufficient, by itself, to give rise to an inference of discrimination. "That [the person who was selected] is of another race, sex, or age may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir.1996). *See McGraw v. Wyeth–Ayerst Labs., Inc.*, No. CIV. A. 96–5780, 1997 WL 799437 *7 (E.D.Pa. Dec.30, 1997) (replacement of female employee with male employee after she was terminated is not enough to demonstrate disparate treatment or raise inference of unlawful discrimination under Title VII); *Hill v. Burrell Communications Group Inc.*, No. 92 C 8343, 1995 WL 76881 at *5 (N.D.Ill. Feb.17, 1995) (by itself, assertion that plaintiff was replaced by black person only satisfies part of plaintiff's burden to make a prima facie case, and does not permit inference of discriminatory animus); *Brown v. Herman's Furniture, Inc.*, 772 F.Supp. 350, 356 (N.D.Ohio 1990) (fact that black female plaintiff was replaced by white male "add[s] nothing beyond establishing plaintiff's prima facie case").

■ One of the only other things that plaintiff relies upon is her contention that Hall never even considered hiring her for the position, and that his meeting with her on October 10 was not a legitimate job interview, but merely an attempt to head off a discrimination suit. There are several flaws in plaintiff's reasoning, however. First, it appears that Hall did consider plaintiff as a candidate; by plaintiff's own admission, Hall sought the opinions of several people about plaintiff's suitability for the job. Had Hall decided from the outset that he did not want to offer her the position because of her race, sex, or for any other reason, there would have been little reason for him to elicit comments from several co-workers about plaintiff.

Plaintiff also states that Downing gave plaintiff a strong recommendation, that Downing had previously recommended Vasile for the position of CFO, and that Hall did hire Vasile for CFO, but did not offer the Human Resources position to plaintiff. Therefore, plaintiff's argument runs, since Hall accepted Downing's recommendation of Vasile, a white male, but not her recommendation of plaintiff, a black female, his actions in this regard can only be chalked up to discrimination. This reasoning is patently specious. These were two completely different positions involving different candidates and different circumstances. To isolate just one factor that was the same in both situations—Downing's recommendation of both plaintiff and Vasile—and conclude from that fact that plaintiff and Vasile were similarly situated in every respect but their race and sex, ignores the many other considerations that were present, and is simply unreasonable.

It is true that at some point Hall did apparently decide that he wanted to hire someone from outside TLP for the Human Resources position, but it is beyond dispute that he did so after receiving advice from several people, not all of whom were as enthusiastic about plaintiff's qualifications as Downing was. Hall himself was a relative newcomer to TLP, having been

hired in January 1995, and it is not surprising that he sought out others' opinions about the desirability of hiring the new Vice President from within TLP. Plaintiff has presented no evidence to rebut the sworn testimony of Vasile and Mower that they told Hall that they did not believe that plaintiff had the needed experience or skills for the position, and that Mower not only recommended someone else (also a female) as the best internal candidate, but even more strongly recommended that Hall choose an external candidate. Only then did Hall direct Vasile to conduct a search for an outsider.

All the evidence shows, then, is that Hall at some point decided that it would be best to hire someone from outside TLP, thereby effectively excluding plaintiff from further consideration. Glaringly absent, however, is any evidence that plaintiff's race or sex played any part in that decision.

As for Hall's alleged interview of plaintiff on October 10, there is some evidence from which a factfinder might conclude that by that point Hall had all but decided to offer the position to Greenawalt, and that plaintiff had little or no chance of being selected instead. Hall's own statement that "[o]ut of courtesy and respect for plaintiff and the internal position she held, ... [Hall] did not feel it appropriate to give Mr. Greenawalt an offer until [he] gave plaintiff an opportunity to interview for the job," Hall Affidavit ¶ 6, suggests that the purpose of the interview was more to assuage plaintiff's feelings than to consider her seriously as a candidate for the position. The fact that Hall told plaintiff that he had hired Greenawalt two days later also suggests that he did not give extensive consideration to plaintiff at that time.

Although that is some evidence of pretext, it is not the kind of pretext that plaintiff must show in order to defeat defendants' motion for summary judgment. A factfinder might reasonably infer from this evidence that the October 10 *meeting* between Hall and plaintiff was pretextual, *i.e.*, that it was not really a job interview but an attempt to mollify plaintiff, but not that Hall's proffered reason for picking Greenawalt over plaintiff—that Greenawalt was a far stronger candidate—was pretextual.

Moreover, even if plaintiff has shown any evidence of the latter type of pretext, that is not enough. "[T]o survive summary judgment [plaintiff] ha[s] to show not only pretext, but also either use of a pretext that itself implies a discriminatory stereotype, or use of a pretext to hide ... discrimination." *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 201 (2d Cir. 1999). "Individual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility.... In short, the fact that the proffered reason was false does not necessarily mean that the true motive was the illegal one argued by the plaintiff." *Fisher*, 114 F.3d at 1337–38.

What weakens plaintiff's case even further, however, is that here there is not even any evidence of such "unbecoming," but lawful, dissembling. In fact, the evidence strongly supports defendants' assertion that Greenawalt was chosen because he had excellent credentials and was well-suited for the job.

██ This is perhaps most strikingly demonstrated by plaintiff's own papers in opposition to defendants' motion. Plaintiff concedes the very strong qualifications of Greenawalt. In attempting to show that defendants should have preferred her over Greenawalt for the Vice President position, however, plaintiff makes the novel argument that defendants should have rejected Greenawalt because he was *over* qualified. Plaintiff recognizes the strength of Greenawalt's experience but attempts to use it as evidence of discrimination. According to plaintiff, Greenawalt's prior position at B & L involved so much more responsibili-

ty, and was so much higher within the organization, than the new Vice President, Human Resources position at TLP, that plaintiff was actually *better* suited for the job and, according to plaintiff's logic, Hall instead chose an obviously overqualified white male simply to avoid hiring a black female.

This argument requires little comment. Plaintiff has cited no case law to support the proposition that an employer's hiring of a candidate with more experience and abilities than are needed for the job can give rise to an inference of pretext. Presumably, if Greenawalt had been less qualified, plaintiff would argue that she was passed over for a discriminatory reason. While there may be times when an employer thinks twice about hiring an "overqualified" candidate—*e.g.*, that if hired he will not remain with the company for long—many employers would be thrilled to find an executive with extensive relevant experience at a large global company. Employers should not have to avoid hiring an eminently qualified person for fear that this will later be used against them in a discrimination suit.

■  Although it appears that Greenawalt was by far the more experienced candidate, the wisdom of defendants' hiring decision is not in issue. Whether plaintiff considers herself to have been the better candidate—indeed, even whether she *was* the better candidate—is not the issue. What matters is why the employer did what it did, not whether it was wise to do so. Title VII prohibits discrimination, not poor judgment. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir.1994) (submission of materials from co-worker or supervisor indicating that employee's performance was satisfactory does not create issue of fact where employer was dissatisfied with employee's performance); *Montana v. First Fed. Savings and Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (federal courts do not have a "roving commission to review business judgments") (quoting *Graefen-*

*hain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir.1987)); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.) (courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process"), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Several other matters bear mentioning. First, the complaint alleges that defendants Hall and West Publishing Corporation constructively discharged plaintiff. Amended Complaint ¶ 26. To the extent that plaintiff may be asserting a discriminatory discharge claim based on this allegation, I find that there are no genuine issues of material fact, and that defendants are entitled to summary judgment. For one thing, as already stated there is no evidence here of unlawful discrimination of any kind. Second, plaintiff has not presented evidence from which a finder of fact could reasonably conclude that she was constructively discharged.

■  To establish a constructive discharge, plaintiff must show that her employer deliberately made her working conditions so intolerable that she was forced to resign. *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983). This burden is not an easy one to carry. The Second Circuit has held that a constructive discharge cannot be established simply through evidence that: the "employee was dissatisfied with the nature of h[er] assignments"; "the employee feels that the quality of h[er] work has been unfairly criticized"; or "the employee's working conditions were difficult or unpleasant." *Stetson*, 995 F.2d at 360.

In short, "a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were ' "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt com-

pelled to resign." ' " *Id.* at 361 (quoting *Pena,* 702 F.2d at 325).

■ Here, the evidence shows only that plaintiff was unhappy that she was not selected for the new Vice President position, and that she was less than satisfied with the alternatives offered to her, because of her subjective belief that they would be a step down from her prior position, solely by virtue of the fact that she would not report directly to Hall. That does not meet the stringent standard for demonstrating constructive discharge. *See Gray v. York Newspapers, Inc.,* 957 F.2d 1070 (3d Cir.1992) (employee's subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination in the future does not constitute constructive discharge); *Dobson v. Unigraphic Color Corp.,* No. Civ. 92–1841, 1994 WL 906665 *3 (M.D.Pa. Sept.30, 1994) ("While plaintiff viewed any reassignment as 'stepping down,' this would not qualify as an intolerable working condition"), *aff'd,* 66 F.3d 310 (3d Cir.1995).

In addition, by her own admission plaintiff reached a point where she simply wanted to leave TLP, regardless of any efforts defendants might have made to placate her, and she was not interested in investigating the nature of any other positions they might have offered her. As stated, she admits that Greenawalt in effect asked her to tell him what he could do that would persuade her to stay, but she admitted at her deposition that was "going to leave. [She] didn't want it [sic] wait to see the fill-in for the job. [She] w[as] just going to leave ...". Rittinger Affidavit Ex. H at 241. Given this undisputed evidence, plaintiff cannot establish a constructive discharge. *See West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir.1995) ("An employee who quits without giving her employer a chance to work out a problem is not constructively discharged"); *Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3d Cir.) (reasonable employee will usually explore alternative ave-

nues thoroughly before coming to the conclusion that resignation is the only option), *cert. denied,* 510 U.S. 964, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993).

■ As for plaintiff's breach of contract claim relating to her severance benefits, the parties agree that under the facts of this case, plaintiff is not entitled to any severance benefits unless she was constructively discharged, since her contract required that she be *"terminated* for any reason other than cause ..." in order to receive such benefits. Since plaintiff was not literally terminated in the commonly understood meaning of that term, and since she cannot demonstrate that she was constructively discharged, this claim must be dismissed as well.

## CONCLUSION

Defendants' motion for summary judgment (Item 28) is granted, and the complaint is dismissed.

IT IS SO ORDERED.