**Angela JORDAN, Plaintiff,**

v.

**OLSTEN CORPORATION and Olsten Health Services, Defendant.**

No. 98–CV–32C.

United States District Court, W.D. New York.

Aug. 15, 2000.

Weiss, Stocker & Fox (Paul David Weiss, of counsel), Kenmore, New York, for plaintiff.

Phillips, Lytle, Hitchcock, Blaine & Huber (Sharon A. Swift, of counsel), Buffalo, New York, for defendant.

**DECISION AND ORDER**

CURTIN, District Judge.

**INTRODUCTION**

Plaintiff Angela Jordan, an African–American woman, brings the present action under Title VII, 42 U.S.C. § 2000e, *et seq.* Jordan claims that her former employer, Olsten Health Services and Olsten Corporation (together referred to as "Ol-

sten"), discriminated against her on the basis of her race when it fired her from her position as a client care coordinator in November 1996. By its present motion for summary judgment, Olsten argues that there is no triable issue of fact regarding the reasons behind Jordan's firing since Jordan has failed to rebut Olsten's legitimate and nondiscriminatory reasons for firing her and has similarly failed to demonstrate that Olsten's proffered reasons for firing her are a mere pretext for race discrimination.

In support of its motion, Olsten has submitted affidavits with supporting exhibits, Items 19 and 22; a statement of material facts, Item 21; and a memorandum of law, Item 20. In response, Jordan and her attorney filed affidavits with various supporting exhibits, Items 25 and 26; a statement of material facts, Item 28; and a memorandum of law, Item 27. Finally, Olsten has replied by submitting an affidavit from a former Olsten supervisor, Item 32; an attorney affidavit, Item 31; and a reply memorandum of law, Item 30. On July 14, 2000, the court heard oral argument.

## BACKGROUND

Olsten is a provider of home-based health care services. Specifically, Olsten provides in-home medical care through a variety of professionals and para-professionals, such as: personal care aides ("PCA"), home health aides ("HHA"), licensed practical nurses ("LPN"), registered nurses ("RN"), physical therapists, occupational therapists, speech therapists, dieticians, and social workers. *See* Item 19, Exh. I, p. 10; and Item 22, ¶ 3.

In November 1994, Olsten hired Jordan as a "staff aide." As a staff aide, Jordan filled in as both a PCA or an HHA whenever Olsten's regularly scheduled workers were unable to report to a client's home. Item 26, Exh. A, pp. 74–75. After working as a staff aide for ten months, Olsten promoted Jordan in September 1995 to the position of a temporary client care coordinator (or "Coordinator"). *See* Item 19, Exh. H, pp. 77–81, 209–210. Then, in December 1995, Joyce Markiewicz, Olsten's local Branch Director, promoted Jordan again by making her position permanent. *Id.* at 80–81.

As a client care coordinator, Jordan's primary responsibility involved scheduling appropriate care providers to cover the shifts required by Olsten's many clients. *Id.* In addition to scheduling, Olsten's Coordinators were responsible for moving quickly on referrals so that Olsten might secure work over its competitors.[1]

Jordan states that she excelled as a client care coordinator from the very beginning. Jordan has testified that her supervisors were very pleased with her work as a temporary Coordinator because she had "brought in a lot of new cases...." Item 26, Exh. A, p. 93. Similarly, Jordan avers that Markiewicz, the Branch Director, continually praised Jordan's efforts throughout the latter months of 1995:

> [Markiewicz indicated to me t]hat I brought [Olsten] a lot of business that the other coordinators didn't pick up, a certain amount, that I was bringing in a lot of new cases for them. A lot more money was coming into the company. I remember a time that [Markiewicz] came over and hugged and kissed me because of my job performance.
>
> . . . .
>
> I [also] remember a time [in late 1995] that she got me a masseuse certificate

---

1. Jordan has explained that Olsten competes with other homecare providers for work that is referred by agencies such as United Cerebral Palsy Association and Hospice of Western New York. These "referring agencies" send open requests for services to several homecare agencies, and then typically accept the first offer received. At Olsten, then, it was the Coordinators' job to seize on these incoming referrals and to process them quickly so that Olsten could secure the business before its competitors did the same. *See generally* Item 26, Exh. A, pp. 100–101.

[as a bonus for Jordan's superior performance.]

Item 26, Exh. A, pp. 102–103.

For her part, Markiewicz partly echoes Jordan and states that while Jordan served as a temporary Coordinator from September to December 1995, she "fulfilled [the job] extremely well." Item 26, Exh. B, p. 40.

However, on January 15, 1996, Markiewicz called a meeting of Olsten's four Coordinators—Jordan, Ada Calderone, Marilyn Holtyn and Tracy Loukatis—in order to address certain problems that the Coordinators were having as individuals and as a team. Item 26, Exh. C, pp. 24–25, 30. After the meeting, Markiewicz followed up with each Coordinator by sending an individualized memorandum. In these memoranda, Markiewicz detailed her concerns with each Coordinator's work. With respect to Jordan, Markiewicz wrote:

As you are aware, Angela, multiple clients have complained that they feel you have not spoken truthfully regarding missed shifts and problematic caregivers. When each event is analyzed, the reality is a lack of follow through and/or miscommunication. . . . .

If you make a mistake, call the client, caregiver, or supervisor. Correct the error, apologize for the inconvenience, document the outcome and move forward. Trying to "fix" something instead of admitting the mistake can often be perceived as dishonest. . . . .

From this day forward, I expect to see consistent improvement in your documentation, better written communication to your fellow coordinators, and better use of the Olsten Computer System. . . . .

. . . .

During the next thirty days and ongoing thereafter, I will expect continued improvement in your job performance, consistent and quality care to our clients, and greater accountability to your coordinating job responsibilities. Please be advised that missed shifts will no longer be tolerated.

Item 26, Exh. G. Jordan insists that Markiewicz directed this meeting and the related memorandum to all of the Coordinators, not just her. *See* Item 26, Exh. A, pp. 125–26, 137–38. Nevertheless, the record unambiguously establishes that Markiewicz called this meeting and specifically drafted a memorandum to Jordan because she had concerns about the way in which Jordan was carrying out her duties as a Coordinator.

### FACTS

In and around mid–1996, Olsten initiated a nationwide restructuring of its employee hierarchy, which Olsten dubbed "the Gold Standard." By implementing the Gold Standard, Olsten sought to standardize the organizational structure of its many offices. In this way, all Olsten employees would have standardized job titles and descriptions and would also have uniform responsibilities. *See* Item 26, Exh. D, p. 12. As part of this new organizational scheme, Olsten required its administrative employees to complete a set of self-study modules that were designed to teach the employees about this new organizational model. Item 19, Exh. I, pp. 49–50.

Thus, in October 1996, Olsten's four client care coordinators—Jordan, Calderone, Holtyn, and Loukatis—stayed after work one day in order to complete their modules together. Item 26, Exh. A, p. 152; Item 19, Exh. H, p. 152. During the course of that meeting, the conversation among the Coordinators turned towards salaries and bonuses for Olsten's administrative personnel at the Cheektowaga, New York office.[2] According to Jordan,

2. Here, the court notes that there is a distinction between Olsten's "administrative" personnel and Olsten's "care provider" personnel. Administrative personnel would include

people like the Branch Director (Markiewicz), the Director of Clinical Management (Mary Martha Russell), the Nursing Supervisors (among them, Scott Orf), and the Client Care

Loukatis initiated the conversation by asking Calderone about a bonus that Calderone had received while Loukatis was out on maternity leave. Item 26, Exh. A, p. 153. At that point, Jordan began to discuss how much several of Olsten's administrative personnel were earning:

> [T]hen I do remember saying, well if I make, whatever the amount was. I said, well, probably Scott [Orf] probably makes like 15 or 16 [thousand], you know Joyce [Markiewicz] and Mary Martha [Russell], they must make 20 or 25 [thousand] or whatever and it was, like I said, it was a joking thing. We were laughing and that was that, we moved on to another conversation.

Item 26, Exh. A, p. 154; see also Item 19, Exh. M, p. 49 (deposition of Calderone). Even though she gave specific dollar figures, Jordan insists that she was only "guessing" at and "joking" about these people's salaries. Moreover, Jordan denies ever seeing any documents that could have given her information regarding the salaries of Olsten's various administrative personnel. Id. at 155–57.

Nothing further came of this conversation until November 6, 1996. At that time, Jordan had complained to Markiewicz regarding Tracy Loukatis and Nancy DeFranco, who were Olsten's on-call Coordinators.[3] Jordan told Markiewicz that Loukatis and DeFranco were shirking their own duties by calling Jordan on the weekends and in the evenings to confer about her clients. Item 26, Exh. C, p. 71. Markiewicz agreed with Jordan that Olsten's on-call Coordinators should not habitually call off-duty Coordinators at home. See id. Thus, Markiewicz sought Loukatis out and confronted her with Jordan's complaints. Item 26, Exh. C, pp. 72–74. According to Markiewicz, Jordan's complaints upset Loukatis, who adamantly denied Jordan's complaints and insisted that it was Jordan who constantly contacted the on-call Coordinators, not the other way around. Item 26, Exh. C, p. 75.

After Loukatis had told Markiewicz her side of the story, she went on to tell Markiewicz of how Jordan had disclosed specific salary figures for several of Olsten's administrative employees at the October 1996 Gold Standard meeting. Id. at 73–76. After listening to Loukatis's allegations, Markiewicz was suspicious of how Jordan had been able to precisely peg what Mary Martha Russell earned as the Director of Clinical Management, as well as what Olsten's four Managers of Clinical Practice earned. Id. at 78–79.[4] Moreover, Markiewicz was "taken back [sic]" and "disturbed" by Loukatis's story, since Olsten considered salary information for administrative personnel to be highly confidential. Id. at 76–80; see also Item 31, Exh. O. Loukatis's recollections were especially troubling to Markiewicz "[b]ecause the information" that Jordan allegedly disclosed at the October 1996 "was accurate and . . . kept . . . [under l]ock and key in my office." Item 26, Exh. C, p. 76.

Markiewicz concluded that if Loukatis's allegations were true, then Jordan had violated Olsten's policy of keeping proprietary information confidential. On this count, Markiewicz was looking to Olsten's Employee Handbook, which provides:

> It is the policy of Olsten Corporation to ensure that the operations, activities and business affairs of Olsten and our clients are kept confidential. If during the course of their employment, employees

---

Coordinators (among them, Jordan). Care provider personnel, on the other hand, would include Olsten's various PCAs, HHAs, LPNs, etc.

**3.** As on-call Coordinators, Loukatis and DeFranco were responsible for dealing with scheduling issues that might arise outside of normal business hours and on weekends.

**4.** Although Loukatis's version of events indicated that Jordan had not identified Markiewicz's salary with as much accuracy, Markiewicz also knew that there were no documents in the Cheektowaga office that revealed what her salary was. Item 26, Exh. C, p. 77.

acquire confidential *or proprietary* information about Olsten and its clients, such information is to be handled in strict confidence and not to be discussed with individuals outside of Olsten. *Employees are also responsible for the internal security of such information* . . . . .

. . . .

. . . Violation of the agreement will be grounds for disciplinary action up to an including termination of employment.

Item 19, Exh. E; *see also id.* Exh. F, ¶ 3 (Jordan's Employment Agreement). Further, Markiewicz was aware of the fact that the Olsten employee handbook expressly provided that salary information was deemed confidential. Item 31, Exh. O.

After considering the matter briefly, Markiewicz came to the conclusion that Jordan's statements regarding administrative salaries constituted a violation of Olsten's confidentiality policy:

Q: . . . [I am referring your attention to the] confidentiality and non-competition that you believe was breached by this discussion?

A: Yes, I believe that [Jordan's statements involved] proprietary information.

Q: It was proprietary; how was it proprietary what a person was paid?

A: It was salary they received from the corporation that they were working for.

**5.** Markiewicz was also quick to point out that the disclosure of salary information for administrative personnel would have differed substantially from the disclosure of salary information for care providers.

Q: Some payroll records—I'm sorry—care giver is one?
A: Angela [Jordan] had access to those.
Q: That wasn't a problem that she knew about care givers?
A: No. Very often Angela would have to investigate something that was on the employee time slip and she would validate time slips as to what was entered in the time system.

Item 26, Exh. C, p. 83.[5] At this point, Markiewicz investigated the incident further. Specifically, during the morning and early afternoon of that same day, Markiewicz "asked each of the [client care] coordinators to come in[to my office] and tell me what occurred during the gold standard training." Item 26, Exh. C, p. 90.

Q: And . . . you met with [the coordinators] individually?

A: I met with them individually and I asked them to please not discuss in-between with the other coordinators what was going on in my office.

Item 26, Exh. C. p. 90.[6]

Once Markiewicz had interviewed other Olsten employees regarding Jordan's statements, Markiewicz summoned Jordan into her office. At the time that Markiewicz called Jordan into her office, she felt that she would almost certainly have to fire Jordan.

Q: And at some point in time did you bring Angela [Jordan] in to talk to her?

A: Yes, at the time of termination.

Q: And at that time you brought her in, did you know you were going to terminate her?

A: Yes.

Item 26, Exh. C, p. 90. Mary Martha Russell, the Director of Clinical Practice, and Scott Orf, one ·of four Managers of Clinical Practice (or "Nursing Supervisors"), were also present for the Novem-

Item 26, Exh. C, p. 97.

**6.** Here, the court notes that Calderone denies that Markiewicz met with her before firing Jordan on November 6. *See* Item 19, Exh. M, p. 54. For the purposes of this motion, though, it does not appear material whether Markiewicz met with all or only some of the other Coordinators who were present at the Gold Standard meeting of October 1996. *See infra* Discussion, Part III, C. In any event, it is clear from Mary Martha Russell's testimony that at least one other person did speak with Markiewicz before Jordan was fired that same day. *See* Item 26, Exh. D, pp. 100–101, 110–113.

ber 6 meeting between Markiewicz and Jordan. Item 26, Exh. A, p. 157.

Markiewicz confronted Jordan about whether she had discussed salary figures at the Gold Standard meeting of October 1996. Item 26, Exh. A, p. 157. In addition, Markiewicz indicated to Jordan that disclosing that kind of information was a violation of company policy and a terminable offense. For her part, Jordan denied having actual knowledge of anyone's salary and tried to convince Markiewicz that she had only been "joking" about and "guessing" at salary figures during the Gold Standard meeting. *Id.* at 157–59. Despite hearing Jordan's side of the story, Markiewicz remained "highly suspect" of how Jordan could have so accurately "guessed" at the salary figures. Item 26, Exh. C, p. 101.

After the confrontation between Markiewicz and Jordan had dragged on for close to an hour, Russell asked Markiewicz to step outside for a moment. At that time, both Markiewicz and Russell excused themselves from the meeting and conferred privately. According to Russell, Markiewicz appeared to be upset by what she was hearing from Jordan. Item 26, Exh. D, p. 126. Russell asked Markiewicz whether she intended to fire Jordan, and Markiewicz responded affirmatively, saying that Jordan had to be fired. In light of how upset Markiewicz appeared, Russell offered to be the person who would tell Jordan that she was being fired. Markiewicz agreed to this arrangement, and the two returned to the meeting with Jordan and Orf. Item 26, Exh. D, pp. 125–27. As soon as they returned to the meeting, Russell informed Jordan that she was being fired effective immediately and that she should leave the building. *Id.* at 126–28.

Although Markiewicz did confer with Russell and instructed her to tell Jordan that she was fired, Markiewicz maintains that she was solely responsible for the decision to fire Jordan. Item 22, ¶ 4; *see also* Item 26, Exh. B, pp. 41–42. Indeed,

Jordan herself recognizes that only Markiewicz had "the power to terminate me . . . ." Item 26, Exh. A, p. 193.

## DISCUSSION

### I. Standard of Law

The standard of law for a summary judgment motion in an action brought under Title VII is well established. Rule 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Under the rule, the burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348. When perusing the record to determine whether a rational fact-finder could find for the non-moving party, however, all reasonable inferences must be drawn in favor of the non-moving party. *See Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

The general principles underlying a motion for summary judgment fully apply to discrimination actions. Although courts should be cautious about granting sum-

mary judgment in cases where motive, intent or state of mind are at issue, *see Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988), "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (ruling that summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion). Consequently, once the moving party has met its burden, the non-moving party in a discrimination action must come forward with evidence upon which a rational factfinder could return a verdict in her favor.

The *McDonnell Douglas/Burdine* framework is not intended to be "a rigid ritual, but simply an orderly way to evaluate proof when discrimination is claimed." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir.1988). Initially, plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. In the present case, Olsten concedes for the purposes of argument that Jordan has successfully established a prima facie claim of racial discrimination. *See* Item 20, p. 11. Therefore, the court may assume that Jordan has carried her initial burden under *McDonnell Douglas/Burdine*.

Assuming that plaintiff has succeeded in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. Should the defendant carry this burden, the presumption of discrimination created by the prima facie case "drops out of the picture," *St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and the burden then remains with the plaintiff to prove by a preponderance of the evidence that the defendant's proffered reason was actually a pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089. At this stage, the plaintiff may survive a defendant's motion for summary judgment if she produces evidence demonstrating the falsity of the employer's proffered reasons and carries her overall burden on the issue of discriminatory intent. The Supreme Court has recently held that a plaintiff may, in certain situations, carry this burden by demonstrating the falsity of the proffered reasons and by relying on the same evidence that was used to establish the prima facie claim. *See Reeves v. Sanderson Plumbing Products, Inc.*, —— U.S. ——, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).[7]

While it is true that " '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that their actions are motivated by factors expressly forbidden by law," *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989)), the plaintiff must still proffer evidence that puts the defendant's intent "genuinely in issue," and "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers*, 43 F.3d at 40.

## II. Olsten's Proffered Reasons

■ Olsten maintains that it fired Jordan because she violated Olsten's policy of confidentiality by discussing salary information for administrative employees. Indeed, the record demonstrates that Markiewicz believed that Jordan had im-

---

**7.** The court acknowledges that *Reeves* dealt with different substantive and procedural law than the present case. That is, the Court there dealt with a claim brought under ADEA and addressed whether the trial court had properly directed judgment as a matter of law in the defendant's favor under Rule 50 of the Federal Rules of Civil Procedure. Notwithstanding these differences, *Reeves* clearly is the most recent word on the proper application of the *McDonnell Douglas/Burdine* framework. As such, this court believes that the standards of law set forth in *Reeves* apply to the present action.

properly learned of and then divulged the salary figures for several administrative personnel at Olsten's Cheektowaga office. Further, Markiewicz believed that such information was protected by Olsten's policy of confidentiality and that, under company policy, Jordan's breach of confidentiality warranted termination of her employment. On a more practical level, Markiewicz closely guarded information regarding the salaries of administrative personnel because, to her experience, disclosure of such information often "create[d] a lot of animosity" among co-workers. *See* Item 26, Exh. C, p. 81.

In light of the foregoing, the court finds that defendant has articulated a legitimate and non-discriminatory reason for firing Jordan.

### III. Jordan's Showing of Pretext

Jordan urges three principal arguments in an effort to show that Olsten's proffered reason for firing her is merely a pretext for the racially discriminatory animus that played a role in the decision to fire her.

#### A. *Evidence of Discriminatory Animus*

Jordan insists that pretext can reasonably be inferred because the record reveals that Mary Martha Russell was biased against and hostile towards Jordan as an African–American. Item 27, pp. 8–9. Here, Jordan has testified that Russell twice addressed a scheduling problem with Jordan first by blindly accepting the word of a white care provider and then by berating and demeaning Jordan in front of her co-workers. Jordan asserts that Russell never dealt with the scheduling problems of white coordinators in a similar fashion. Item 26, Exh. A, pp. 199–201. In addition, Jordan relates an incident in which Russell, while mediating a dispute between Jordan and another Coordinator, implied that Jordan was successful as a care Coordinator only because Jordan—like many of Olsten's care providers—was African–American and, as a result, had a special connection with many Olsten care provid-

ers. *Id.* at 199, 205–06. Taken together, Jordan argues that these incidents give rise to a reasonable inference that Russell was racially prejudiced against her.

The court need not reach the issue of whether Jordan's testimony creates an inference that Russell bore discriminatory animus towards Jordan because Olsten has submitted unrebutted evidence that it was Markiewicz, and Markiewicz alone, who made the decision to fire Jordan. In an effort to rebut this conclusion, Jordan has testified as follows:

> Q: ... Would you have any explanation then for why [Markiewicz] would suddenly terminate you because you were black if you had such a good working relationship [in the past]?
>
> A: I don't think it was all Joyce's decision. Mary Martha was in the room at the time. Mary Martha was making the initiative, is the one who basically carried the conversation. Joyce was there but she really didn't talk that much. She signed [the termination letter] but it was basically Mary Martha who did the talking, not Joyce.

Item 26, Exh. A, p. 210. Here, Jordan merely speculates that Russell played a role in Markiewicz's decision to fire her. The evidence, on the other hand, demonstrates that only Markiewicz had the authority to fire Jordan and that Markiewicz made this difficult decision on her own.

While Russell did confer with Markiewicz about how Markiewicz wished to proceed at the November 6 meeting, the record is devoid of evidence that Russell exerted any influence over Markiewicz's decision-making process. Rather, Markiewicz has averred that she made the decision to fire Jordan without seeking out the opinion of other Olsten supervisors. In addition, Russell has testified that:

Q: So if [Markiewicz] didn't have the fortitude to do something you had to push her?

A: No, I didn't push her.

Q: Well she needed your support or enticement to get her to do something?

. . . .

A: It was her decision to make. . . .

. . . .

Q: It wasn't until after you pulled her out of the room and said to her what are you going to do, do you want her fired today?

A: Or had she changed her mind based on—that was the option. The ball was in Joyce's court. Based on what Angela had said to her the conversation that she had with Joyce [I asked myself] had Joyce changed her mind.

Q: And what was Joyce's response?

A: She said that she wanted her gone.

Item 26, Exh. D, pp. 130, 132–33.

▮ The foregoing evidence is unrebutted and demonstrates that Markiewicz was solely responsible for the decision to fire Jordan. As such, any alleged race bias of Russell does not tend to show the pretext of Olsten's proffered reason for firing Jordan, since it is well established that statements by non-decision makers and actions unrelated to the adverse decision cannot support an inference of pretext. *See, e.g., de la Concha v. Fordham Univ.,* 5 F.Supp.2d 188, 194 (S.D.N.Y.1998), *aff'd,* 173 F.3d 843, 1999 WL 197210 (2d Cir. 1999).[8]

▮ As for Markiewicz, the record establishes that far from being prejudiced against African–Americans, or any other minority, Markiewicz treated all employees fairly and equally. As Jordan herself states: "I thought I had a very good relationship with Joyce [Markiewicz]. I've always spoken very highly of her. I thought she was very fair. I thought she was a very good boss and I enjoyed my time at Olsten when I was a coordinator." Item 26, Exh. A, p. 103. In addition, an inference of discriminatory animus is less reasonable where the person who fired the plaintiff was also responsible for hiring or promoting the plaintiff in the recent past. *See, e.g., Anderson v. Anheuser–Busch, Inc.,* 65 F.Supp.2d 218 (S.D.N.Y.1999). In this case, Markiewicz promoted Jordan in December 1995 by making her position as a Coordinator permanent. *See* Item 26, Exh. A, pp. 92–93, 209–10, and Exh. B, pp. 37–40.

**B.** *Insufficient Notice of Confidentiality Policy and Insufficient Investigation*

Jordan also claims that the pretext of Olsten's proffered reasons is demonstrated by the careless and arbitrary way in which Olsten enforced its alleged policy of confidentiality against her. First, Jordan claims that she was never given proper notice of the fact that Olsten considered salary figures for administrative personnel to be confidential. *See* Item 25, ¶ 13. However, this argument fails in light of the fact that the Olsten employee handbook expressly states that "employee salaries" are considered "to be confidential information." Item 31, Exh. O. Further, the record indicates that Jordan acknowledged receiving and reading Olsten's employee handbook. Item 19, Exh. D. Thus, the

---

8. For substantially similar reasons, the court rejects Jordan's reliance on the alleged race bias of Charlene Brosius, an Olsten supervisor. Jordan makes vague allegations regarding Brosius's race bias: that Brosius was "standoffish" to African–Americans and declined to be photographed at a holiday party with a group of employees that included African–American employees. *See* Item 26, Exh.

A, pp. 193–204. Based on the foregoing, the court finds that the record does not support a finding that Brosius was prejudiced against African–Americans. In any event, what Brosius said or did is irrelevant, since it is undisputed that Brosius was not even working in the Cheektowaga office when Markiewicz made the decision to fire Jordan. *See id.* at 193, 197–98.

record does not support the argument that Jordan was effectively "ambushed" by Markiewicz's enforcement of the confidentiality policy.

Next, Jordan argues that pretext is evidenced by the way in which Markiewicz conducted her investigation into the allegations against her. Item 27, p. 10. First, Jordan insists that Markiewicz unreasonably relied on interviews with Tracy Loukatis and Nancy DeFranco—both of whom were involved in a work-related dispute with Jordan on November 6. Item 26, Exh. C, p. 74. Second, Jordan points out that there was simply no evidence to support the conclusion that Jordan had learned of the salary information in an improper or illicit way; that is, there was no evidence that Jordan had broken into Markiewicz's files or that Jordan had secretly reviewed documents containing the salary information. *Id.* at 99–101. In essence, Jordan insists that Markiewicz unreasonably failed to credit Jordan's explanation for her salary-related statements—which was that Jordan was only guessing at her superiors' salaries in a joking manner and the fact that she may have accurately stated what those salaries were was coincidental.

■ By making these arguments, however, Jordan cannot evade precedent from this circuit, which provides that Title VII does not provide remedies against poorly thought-out or unwise employment actions, but only against racially discriminatory employment actions. "What matters is why the employer did what it did, not whether it was wise to do so. 'Title VII prohibits discrimination, not poor judgment.'" *Hines v. Hillside Children's Center,* 73 F.Supp.2d 308, 320 (W.D.N.Y.1999) (quoting *Gumbs v. Hall,* 51 F.Supp.2d 275, 282 (W.D.N.Y.1999)). Thus, Title VII does not protect Jordan if, as she alleges, Markiewicz conducted a shoddy investigation into the allegations and subsequently made a poorly informed decision to fire her. That is, it is irrelevant whether Markiewicz did a sub-standard job of investigating and reaching a decision. Instead, Jordan

must produce evidence that it was Markiewicz's discriminatory animus that motivated her to investigate the allegations and then make her decision to fire Jordan.

Here, the court has already noted that the record not only fails to raise an inference of Markiewicz's discriminatory animus, but it tends to show that Markiewicz was a fair and even-handed supervisor who was liked and respected by her employees—including Jordan.

Similarly, Jordan cannot survive Olsten's motion simply by arguing that Markiewicz unwisely refused to credit Jordan's explanation that she had only been joking and guessing when she discussed the salaries of her superiors. On this count, the record demonstrates that Markiewicz was "highly suspect" of how Jordan could have so accurately "guessed" at such information and that Markiewicz harbored the suspicion that Jordan had learned the salary information by improper means.

Finally, Jordan attempts to show pretext by arguing that Markiewicz patently misapplied Olsten's confidentiality policy by finding that there was a breach when Jordan had only discussed salary figures with other Olsten employees. "It seems to [me] that even if salary information was confidential or proprietary, discussion with individuals *inside* Olsten did not violate the confidentiality policy. The confidentiality policy prohibited the dissemination of information to individuals outside Olsten, not discussion among employees." Item 25, ¶ 15. The court rejects this argument as well. The Olsten employee handbook not only required that sensitive information "be handled in strict confidence and not . . . be discussed with individuals outside of Olsten," but that "[e]mployees are also responsible for the internal security of such information." Item 19, Exh. E. Thus, Markiewicz may have reasonably concluded that Jordan breached confidentiality by sharing salary-related information with her fellow employees.

In light of the foregoing, the court rejects Jordan's argument that the pretextual nature of Olsten's proffered reasons is demonstrated by the allegedly careless way in which Markiewicz enforced Olsten's confidentiality policy.

### C. *Disparate Treatment*

Finally, Jordan briefly argues that there is an inference of disparate treatment since: (1) all four employees present at the Gold Standard meeting "participated" in the conversation regarding salaries; (2) Jordan was the only African–American among them; and (3) Jordan was the only employee who was disciplined for her participation in that conversation. Item 27, p. 11.

After carefully examining the record, however, the court finds that the facts do not support Jordan's argument of disparate treatment. Rather, the record reveals that two of the other client care coordinators present at the meeting only reacted or responded to Jordan's disclosure of salary figures for administrative employees. As for Tracy Loukatis, she was asking Ada Calderone about a bonus that Calderone received while Loukatis was out on maternity leave. Then, Jordan volunteered what she believed Markiewicz, Russell, and Orf were earning. At that time, Loukatis reacted with dismay that Coordinators earned far less. The record does not indicate, however, that Loukatis joined Jordan by disclosing salary figures for other administrative employees at Olsten.

As for Ada Calderone, the record again reveals that she did nothing more than react to Jordan's representations regarding the salaries of their superiors.

Q: ... What did you say or [what] comments did you make in regard to what Angela said regarding salaries?

A: I just went wow. That's about all. Wow, that's a lot of money.

Item 19, Exh. M, p. 52. Moreover, Calderone has testified that the other Coordinators present at the meeting similarly limited their responses to Jordan's statements.

Q: What did Tracy [Loukatis] do or say in regard to what Angela said?

A: What did she say? What did Tracy say? I think it wasn't so much what she said but the way she reacted.... She got a little bit more upset like I don't know I think she took it more in heart than all of us....

Q: What about Marilyn [Holtyn]?

A: No. She was calm as a cucumber.

Q: Did she make any comments or add to the discussion?

A: No. Marilyn was just like wow.

*Id.*

In short, the record demonstrates that Jordan was the only employee present at that Gold Standard meeting who made any statements regarding the specific salary figures of administrative employees at Olsten. Again, it was for that offense—the disclosure of confidential salary information—that Markiewicz fired Jordan. Since there is no evidence that any of the other Coordinators present at the Gold Standard meeting made similar comments regarding salary figures, there is no evidence of disparate treatment.[9]

On a related note, Jordan attempts to raise an inference of disparate treatment by averring that Olsten staff members "routinely" discussed salaries: "[O]n several occasions I discussed with Darlene

---

9. Although the parties do not make much of this, the court also notes that the record contains testimony regarding a situation in which some of Olsten's care providers discussed their pay rates with an Olsten patient. *See* Item 26, Exh. C, pp. 87–88. In that situation, the employees received a warning and some disciplinary "counseling." *Id.* The fact that those employees were not fired, however, does not give rise to an inference of disparate treatment, since pay rates for care providers are widely known throughout the Olsten staff and are not considered confidential. *See id.* at 96–97.

Kirksey, a payroll clerk, salaries and wage information for in-house supervisory and field staff members." Item 25, ¶ 9. However, the court finds that Markiewicz's testimony negates any force that this argument might have: "Prior to plaintiff's termination, I had never before been advised of or presented with a situation in which an employee obtained or disclosed confidential salary information of administrative employees." Item 22, ¶ 5. Thus, Jordan's subjective belief that it was acceptable for Olsten employees to discuss the salaries of administrative employees does not undermine Markiewicz's unrebutted statement that she believed such information was confidential and that disclosure of that information was a terminable offense.

## IV. Effect of *Reeves v. Sanderson Plumbing Products, Inc.*

At oral argument, plaintiff's counsel relied on the Supreme Court's recent decision in *Reeves v. Sanderson*, —— U.S. ——, 120 S.Ct. 2097, 147 L.Ed.2d 105. There, the Supreme Court clarified the nature of a plaintiff's ultimate burden under the *McDonnell Douglas/Burdine* framework. Writing for a unanimous court, Justice O'Connor clarified "the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence": "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 120 S.Ct. at 2109.

However, the Court in *Reeves* went on to add that:

This is not to say that such a showing [of falsity or pretext] by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no ra-

tional factfinder could conclude that the action was discriminatory.

*Id.*

The court finds that *Reeves* is not factually on point with the present case since there are substantial differences in the quantity and quality of proof presented by the respective plaintiffs. In *Reeves*, the Court found that the plaintiff had firmly established a prima facie case through substantial evidence and that this evidence supported the jury's inference that the plaintiff's firing had actually been the result of discriminatory animus.

In this case, Olsten did not seek to dispute whether Jordan had established a prima facie claim of discrimination. In the future, perhaps *Reeves* will cause all defense counsel to be more reluctant to concede for the purposes of argument that a plaintiff has established a prima facie case. Notwithstanding Olsten's concession on the prima facie claim, though, the court has reviewed the record as a whole and for the reasons discussed *supra* finds that the evidence supporting an inference of discriminatory intent is insubstantial and that, as a matter of law, it could not support a verdict in Jordan's favor. Under *Reeves*, the court finds that the present case is one "where, although [the employer concedes that the] plaintiff has established a prima facie case and" the plaintiff has perhaps "set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." 120 S.Ct. at 2109.

## CONCLUSION

Defendant Olsten has articulated a legitimate and non-discriminatory reason for firing Jordan, in that Markiewicz genuinely believed that Jordan had violated Olsten's policy of confidentiality by disclosing information regarding the salaries of Olsten's administrative employees. In response, Jordan has failed to demonstrate that the proffered reason is merely a pretext for racial bias. Indeed, the record

demonstrates that Markiewicz was solely responsible for the decision to fire Jordan and, furthermore, fails to support the inference that Markiewicz harbored discriminatory animus against Jordan or other minorities. Therefore, defendant's motion for summary judgment is granted. The complaint is dismissed, and judgment shall enter for defendant.

So ordered.