**Janita K. BYARS, Plaintiff,**

v.

**JAMESTOWN TEACHERS ASSOCIATION,
Defendant.**

No. 98–CV–15C.

United States District Court,
W.D. New York.

March 17, 2002.

402

**404**

Anna Marie Richmond, Buffalo, New York, for Plaintiff.

Zdarsky, Sawicki & Agostinelli (K. Michael Sawicki, of Counsel), Buffalo, New York, for Defendant.

## INTRODUCTION

CURTIN, District Judge.

On December 10, 1997, plaintiff Janita K. Byars ("Dr.Byars") filed this action against defendant Jamestown Teachers Association ("JTA"), asserting claims for employment discrimination under Title VII of the Civil Rights Act, as amended; conspiracy under 42 U.S.C. § 1985(3); as well as claims under State statutory and common law. Item 1. Dr. Byars later amended her complaint to add the Jamestown City School District ("School District") as a defendant. Item 9. Extensive discovery took place. The School District and plaintiff arrived at a settlement. Item 54. Subsequently, the JTA filed a motion for summary judgment, Item 44, which plaintiff opposed. Items 46–49. Further briefing followed; and on November 9, 2001, oral argument was held. Plaintiff's counsel then submitted a letter and exhibits addressed to certain assertions proffered by counsel during oral argument. Item 56.

For the reasons that follow, the court grants defendant's motion for summary judgment.

## FACTS

The undisputed facts in this case are as follows. The Jamestown City School Board appointed Dr. Byars to a three-year probationary period of employment as Principal of the Jamestown High School ("JHS" or "the High School"), at the end of which it would make a decision on whether she would be offered tenure.[1] Dr. Byars' term began in September 1994. Item 44, ¶ 1. In June 1997, the School

---

**1.** New York Education Law §§ 2509(1)(b) and (2) provides that public school principals are appointed by the Board of Education, upon the recommendation of the Superintendent of Schools, for a probationary period of three years, during which period they can be discontinued at any time by a majority vote of the Board. At the end of the three-year probationary period, the Superintendent of Schools must make a recommendation to the Board as to whether the principal shall receive tenure. *See* Item 46, p. 5.

Board voted to deny Dr. Byars tenure, and her employment with the District terminated. *Id.*, ¶ 2. Beyond these basic facts, and the fact that both plaintiff and defendant have characterized the general atmosphere in the High School while Dr. Byars served as principal as "tense," Item 44, Sawicki Aff., ¶ 7; "in a state of chaos," Item 44, Peters Dep., p. 48; "nervous breakdown" and "dysfunctional," Item 48, Ex. D, ¶¶ 82, 83, the parties' views on the reasons for that charged atmosphere comprise the subject matter of this case. Dr. Byars has claimed that the problems at JHS were a manifestation of the JTA's and the School District's bias against her because she is a woman and because she is a lesbian. While the JTA admits that it "opposed certain activities of the plaintiff," Item 10, ¶ 7, it categorically denies that bias was at the root of its opposition.

In June of 1995 and 1996, Dr. Byars, who had extensive experience as an educator, Item 48, Ex. A, received very good evaluations of her performance as JHS principal from Assistant Superintendent Robert Sigler. Item 48, Exs. I and J. The June 1996 evaluation recommended "her continued service to the district." Item 48, Ex. J, p. 10. In August of 1996, Dr. Byars met with James Coffman, who was Director of Secondary and Middle Level Education, and Craig King, Superintendent of the Jamestown School District, to discuss her "career and [her] future with Jamestown." Item 44, Exhibits, Byars Transcript, p. 76. They presented Dr. Byars with a list of five concerns,[2] Item 48,

Ex. K, regarding "educational requirements and [her] performance as principal ...." Item 48, Ex. C, p. 77. Dr. Byars characterized the tone of the meeting as "ominous" and "[n]egative," *id.*, pp. 76, 77, such that she questioned whether they were "putting [her] on notice." *Id.*, p. 76. She subsequently acknowledged that the meeting was part of the evaluation process to address leadership areas where she needed improvement, *id.*, pp. 80–82, that they discussed legitimate areas of concern, *id.*, p. 77, and that nothing derogatory, improper, or discriminatory was said to her or implied at this point, Item 44, Byars Transcript, p. 96. Nevertheless, Dr. Byars testified at her deposition that, in her experience, the meeting did not represent a standard approach to doing an evaluation.[3] Item 48, Ex. C, p. 80.

At the end of October 1996, both Mr. Coffman and Mr. King again met with Dr. Byars to review her progress toward the goals set forth in the previous meeting. Item 44, Byars transcript, p. 97. Dr. Byars had prepared her files and assembled "supporting evidence of work that I had done and we talked through it." *Id.* Approximately eight or nine days later, while at home one evening, Dr. Byars received a telephone call from Mr. King. He asked to meet with her the next morning. When asked about the topic of the meeting, Mr. King responded, "a couple of things." *Id.*, p. 99. The meeting took place on November 6, 1996. According to Dr. Byars, Mr. King told her that "the school board had met, that they told [him]

---

**2.** The items, according to Dr. Byars, "were lifted out of the [1995–96 Sigler] evaluation out of context and if you take the whole section, ... there's a lot of positive evidence of my work at Jamestown High School. They did not refer to that. They lifted from that these statements which out of context meant something different." Item 48, Ex. C, pp. 81–82.

**3.** Dr. Byars' deposition transcript reflects some confusion about whether the presentation of the list of five items and Dr. Byars' characterization of the tone of the meeting refer to the August 1996 or October 1996 meeting, and whether both Coffman and King attended the August meeting. Item 48, Ex. C, pp. 75–77, 80–82.

that even if he recommended me for tenure, they would not vote positively . . . ." *Id.*, p. 100. She did not know who on the Board had relayed this message to the Superintendent. *Id.*, p. 101. Mr. Coffman, who was also present at this meeting, disputes Dr. Byars' recollection of Mr. King's statement. Item 48, Ex. H, pp. 251–52.

Dr. Byars left the meeting very upset. Item 44, Byars transcript, p. 106. When she returned to the High School, she encountered teachers Carolyn Whitehead and William Boerst. When asked what was wrong, Dr. Byars informed them that she was not going to receive tenure. Item 48, Ex. C, p. 106. The next day, November 7, 1996, Ms. Whitehead, a supporter of Dr. Byars, had a confrontation with David Mazzone, a teacher and JTA Secretary. Mr. Mazzone wrote a note to Mr. Coffman, complaining about Ms. Whitehead's manner. Item 48, Ex. L.

During Dr. Byars' period of employment at JHS, the JTA newsletter, "JTALK," distributed regularly at the High School since the early 1990s, began to list all the grievances that the JTA had filed. Item 46, p. 4. Many grievances were listed against Dr. Byars personally, Item 48, Ex. D, ¶ 43, and resolved grievances were not removed. JTA Vice President Gary Peters could not provide a reason why resolved grievances continued to be listed. Item 48, Ex. G, pp. 31–32.

As a result of the "unrest" at the High School, the JTA asked the State Teachers' Union, the National Education Association–New York ("NEA"), to make an assessment of the problems at JHS. Item 48, Ex. M, p. 20. JTA President Bruce Carpenter stated that the JTA did not know how "widespread" the unrest was, or if

there were "underlying reasons" for it.[4] *Id.*, p. 21. The JTA thought that if an outside agency was brought in, "with no real stake, perhaps we could get a little better hand on the way things-the way people really felt, what was really going on." *Id.* Superintendent King granted the NEA permission to conduct its inquiry at the High School. Item 48, Ex. M, p. 24. The NEA asked the Superintendent and the Board of Education to submit questions to the assessment team concerning any matters they wanted the team to address. Item 48, Ex. M, pp. 23–24.

Teacher Carolyn Whitehead expressed her opposition to the upcoming NEA assessment to teacher and Union member Jeffrey Keppel. According to the plaintiff, Whitehead's comments caused Keppel to file a grievance on November 8, 1996 against Dr. Byars concerning those comments. Item 46, p. 9; Item 48, Ex. N.

The NEA conducted its assessment during December 9–11, 1996. The Report, entitled, "Jamestown High School Assessment–A report on a variety of issues of concern to members of the National Education Association of New York and the Jamestown Teachers Association working at the Jamestown High School" ("NEA Report"), was published later that month. Item 51, Ex. C. The NEA Report indicated that its goal was to meet the needs of the JTA membership employed at JHS, and addressed the question, "What would you change with regard to policies, programs and procedures at Jamestown High School that you believe would create for the staff and students the ideal place to work and learn?" *Id.*, p. 1. While the NEA Report did make reference to a "small cadre of school employees who see the building

---

4. This assessment was not the first one made of schools in the Jamestown district. Item

48, Ex. M, pp. 19–20.

problems as being exploited by the 'unionist' [sic] to oust the top building administrator," *id.*, Findings, ¶ 9, it went on to say that "there are those who see this cadre and [sic] a group who would sacrifice the integrity of the entire school simply to save the job and reputation of the top school administrator." *Id.* The NEA Report's first recommendation was that "[t]he district must act immediately to effect a change of principal at JHS. The risk of the fractionalization expanding to the entire faculty is real and the resulting harm would be of a long range nature. Time is of the essence." *Id.*, p. 3. The Report contained the proviso that it "may not be used for any purpose, in whole or in part, by any individual, group, organization, authority or publication without the expressed written permission of the JTA and the National Education Association of New York (NEA/NY)." *Id.*, p. 1.

Superintendent King was provided with a copy of the Report, Item 10, ¶ 13, as were the fifteen members of the JTA executive committee. Item 48, Ex. M, p. 29. Despite the limitations imposed on its circulation, *supra*, the NEA Report was distributed anonymously outside the School District. A Superintendent of Schools in another school district received a copy, mailed in a Jamestown High School Guidance Office envelope. Item 48, Ex. O, pp. 201–02. The Chairperson of the JHS Guidance Department, Julie Zaffalon, testified that she did not know how a copy of the document came to be mailed in a Guidance Department envelope to another Superintendent. *Id.*, p. 202. She stated she was unaware that she was reported to have admitted to people that she mailed out copies, and stated that if a person had made that claim, "[t]hey would be lying." *Id.* She added that Mr. Coffman had indicated to her that he and Mr. King "felt that it might have come right from [Dr. Byars], to kind of get me or get the district or whatever." *Id.*, p. 203. The report was eventually published in the local newspaper in March 1997. Item 12, ¶ 33.

Following publication of the NEA Report, the climate at JHS continued to deteriorate. During spring 1997, various teachers criticized JTA policies and expressed support for Dr. Byars. *See generally* Peterson, Boerst, and Oram affidavits, Item 48, Exs. D, E, and F. One of those outspoken teachers claims he was retaliated against by the JTA for supporting Dr. Byars. *Id.*, Ex. E, ¶¶ 45–48.

On March 7, 1997, Mr. Coffman sent a memorandum to Superintendent King regarding "Request to Remove Dr. Byars from J.H.S." Item 44, Plaintiff's Deposition # 3,[5] p. 1. In this seven-page document, Mr. Coffman provided examples of Dr. Byars' negative role in various problems and incidents at the High School. The document referred to a communications breakdown between Dr. Byars and the faculty and staff, and to a "lack of trust, and a feeling that the principal had abdicated her administrative authority to a small group of her teacher friends. Factioning and public lobbying became a vicious circle, which at this juncture cannot be stopped with the exception of the removal of Dr. Byars from the building." *Id.*, p. 6. He concluded that "a change in leadership will be required to solve this problem." *Id.*, pp. 6–7.

At a meeting held on June 10, 1997, the School Board officially denied tenure to Dr. Byars. Item 10, ¶ 20. Dr. Byars then engaged in a search for other employment, applying for over eighty positions in New York, New Jersey, and Pennsylvania.

---

5. This exhibit had been incorrectly labeled as Plaintiffs Deposition # 3, when it was in fact Mr. Coffman's March 7, 1997 Memorandum to Mr. King.

Item 9, ¶ 46. She secured a position in November 1998. At her deposition, she testified that she felt that the distribution of the NEA report was "very negative" and that she had been "blacklisted" in her job search. Item 48, Ex. C, p. 493. Dr. Byars provided examples of jobs for which she had interviewed where the interviewer referred to issues raised in the Report. *Id.,* pp. 484, 494–96.

As indicated above, Dr. Byars first filed suit against the JTA in December 1997, Item 1, and amended her complaint nine months later to add the School District as a defendant. Item 9. She asserted claims against the JTA for: sex discrimination pursuant to both Title VII and the New York State Human Rights Law, § 296(c); conspiracy with the School District pursuant to 42 U.S.C. § 1985(3); tortious interference with contract; tortious interference with prospective economic advantage; and intentional infliction of emotional distress. After extensive discovery, the JTA moved for summary judgment. Item 44.

## DISCUSSION

### I. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Under the rule, the burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment "[a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.; Gallo v. Prudential Residential Services,* 22 F.3d 1219 (2d Cir.1994).

After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (*quoting* Fed.R.Civ.P. 56(e)). "The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (citations omitted). The affidavits must "set forth such facts as would be admissible in evidence ...." Fed.R.Civ.P. 56(e).

" 'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." '" *Matsushita,* 475 U.S. at 599, 106 S.Ct. 1348 (citations omitted). In evaluating a summary judgment motion, "the judge's function is not ... to weigh the evidence and to determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sutera v. Schering Corp.,* 73 F.3d 13, 15 (2d Cir.1995). When perusing the record to determine whether a rational fact-finder would find for the nonmoving party, "a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party."

*Sorlucco v. New York City Police Department,* 888 F.2d 4, 6 (2d Cir.1989).

It is well established that

[t]he general principles underlying a motion for summary judgment fully apply to discrimination actions. Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *see Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988), "the salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to commercial or other areas of litigation."

*Jordan v. Olsten Corp.,* 111 F.Supp.2d 227, 232–33 (W.D.N.Y.2000) (citation omitted).

The JTA argues that there is "no proof whatsoever that there was any invidious discrimination against plaintiff carried out by the JTA," Item 50, p. 1, and that the plaintiff "cannot submit any proof in evidentiary form, because none exists, which would raise any triable issue of fact regarding the liability of the JTA to [Dr. Byars] under any of plaintiff's causes of action." Item 44, Sawicki Aff., ¶ 5. Dr. Byars, on the other hand, provides documents in support of her contention that the Union discriminated against her because of her sex and attempted to cause the School Board to discriminate against her as well. Item 9, ¶ 111.

## II. Title VII and New York State Executive Law Claims of Sex Discrimination

### A. Standard Under Title VII

In a Title VII case, the burden a plaintiff bears in proving discrimination follows the three-step, burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny.

*Bickerstaff v. Vassar College,* 196 F.3d 435, 445 (2d Cir.1999). Under this framework, a plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. *Olsten,* 111 F.Supp.2d at 233. Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant to rebut this presumption by articulating a legitimate, non-discriminatory reason for its actions. *Id.* The burdens for both plaintiff and defendant on each of these steps are not demanding. *See Bickerstaff,* 196 F.3d at 446. If the defendant offers a legitimate, non-discriminatory reason for a challenged employment action, the plaintiff then has the opportunity to demonstrate "that the proffered reason was not the true reason for the employment decision," and that gender was. *Id.* "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false now merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (*i.e.,* that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Id.* at 446–47.

A violation of Title VII can be shown by either direct, statistical, or circumstantial evidence. *Id.* at 445.

[A]s discrimination will seldom manifest itself overtly, courts must 'be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law'. However, they must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.

*Id.* at 448 (citations omitted). This undertaking does not involve guesswork or theorization: "[a]n inference is not a suspicion or a guess. It is a reasoned, logical deci-

sion to conclude that a disputed fact exists on the basis of another fact [that is known to exist]." *Id.* (citation omitted). "Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." *Id.*

The standard and burden of proof under the New York State Human Rights Law have been held to be virtually identical to that under Title VII. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n. 4, 1306–07 (2d Cir.1995).

## B. Discussion

### 1. Jurisdiction

As a preliminary matter, even though defendant did not raise the issue, and plaintiff touched upon it only briefly, Item 46, pp. 14–15, the court refers to a Title VII-related jurisdictional matter which has a bearing on how the facts of this case are analyzed. In her complaint, Dr. Byars claims that the JTA has violated 42 U.S.C. § 2000e-2(c). Item 9, ¶ 111. In her Memorandum of Law, she argued that the JTA was subject to suit under section 2(c)(3). Item 46, p. 14. The question is whether the JTA may be held liable by Dr. Byars under Title VII.

▮▮▮ Title VII of the Civil Rights Act of 1964 reserves a separate section for labor organization practices. The statute provides:

It shall be an unlawful employment practice for a labor organization -

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of

his race, color, religion, sex, or national origin;

. . . . .

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

42 U.S.C. § 2000e-2(c).

Dr. Byars charges the JTA with having "engaged in an ongoing pattern of discriminatory practices against plaintiff, including the filing of excessive, unfounded grievances; the public slander of her name and character; and the dissemination of incompetent information intended to harm her and her reputation," Item 9, ¶ 106, which would indicate a claim under 2(c)(1). She also charges the Union with having "worked with agents, representatives, officers and employees of defendant District to deny plaintiff her right to be free from discrimination with respect to her compensation, terms, conditions and privileges of employment." *Id.*, ¶ 107. This would be a claim under section 2(c)(3).

The court has jurisdiction of Dr. Byar's claim under 42 U.S.C. § 2000e-2(c)(3). *See Air Line Pilots Assn. Int'l. v. Trans World Airlines, Inc.*, 713 F.2d 940, 956 (2d Cir.1983), *aff'd and rev'd in part*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Carter v. Chrysler Corp.*, 173 F.3d 693, 703 (8th Cir.1999). It also has jurisdiction over her claim pursuant to section 2(c)(1), given that "the plain language of the statute suggests that unions may be liable for any discrimination ...." *Dowd v. United Steelworkers of America, Local 286*, 253 F.3d 1093, 1102 (8th Cir.2001).[6] The court

---

**6.** Cases that cite subsection 2(c)(1) usually concern unions which discriminate in some way against their own members, even though that subsection of the statute does not require union membership in order to be applicable. See *Dowd v. United Steelworkers of America*, 253 F.3d 1093 (8th Cir.2001). Dr. Byars is

not a member of the JTA, and the JTA is under no obligation to protect her employment status with the District. Although she asserts that the Union discriminated against her *per se* on the basis of gender by filing unwarranted grievances against her and by slandering her character, her main contention

will focus on Dr. Byars' claims under section 2(c)(3), although it will also determine, in the process of that examination, whether her per se allegations of discrimination under section 2(c)(1) can withstand the defendants' motion for summary judgment.

## 2. Sexual Orientation

█ Dr. Byars has submitted evidence that she was discriminated against on the basis of her sexual orientation. However, neither Title VII nor the New York State Human Rights Law provides protection against discrimination on the basis of sexual orientation. *Simonton v. Runyon,* 232 F.3d 33 (2d Cir.2000); *Nacinovich v. Tullet & Tokyo Forex Inc.,* 257 A.D.2d 523, 524, 685 N.Y.S.2d 17 (1st Dept.1999). Therefore, to the extent that plaintiff seeks protection and redress under either of these statutes on the basis of sexual orientation, the court has no jurisdiction to consider these claims.

## 3. Uniqueness of this Title VII Claim

The alignment of the parties in this case makes an analysis under traditional Title VII law inexact at best. Very few cases have been brought where plaintiffs seek to hold a union defendant liable under either sections 2(c)(1) or 2(c)(3) of 42 U.S.C. § 2000e. The court has found only one case where defendants allegedly liable under section 2(c)(3) brought a motion for summary judgment. *Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc.,* 713 F.2d 940, 956 (2d Cir.1983). Often the plaintiffs are members of the union and charge their union with causing the employer to discriminate, for example, by maintaining a discriminatory seniority system, *Equal Employment Opportunity Com'n v. DuPont,* 1992 WL 465707 (W.D.Ky. Nov.16, 1992); with acquiescing in the employer's administration of facially

neutral tests that had an adverse impact on plaintiffs, *Howard v. Int'l Molders & Allied Workers Union,* 779 F.2d 1546; by helping the employer to discriminate by failing to process sexual harassment complaints (surviving a motion to dismiss), *Marquart v. Lodge 837, Int'l Assn. of Machinists & Aerospace Workers,* 26 F.3d 842 (8th Cir.1994).

In most employment discrimination cases, the court analyzes the plaintiff's claims under the traditional burden-shifting framework set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Here, the *McDonnell Douglas* paradigm does not fit. To establish a prima facie case, it is understood that the adverse employment action about which a plaintiff complains has been taken by her employer, not by another party. Further, when the burden shifts to the defendant (usually the employer), the defendant is then required to articulate a legitimate reason for the adverse employment action. Neither of these steps applies here because Dr. Byars was not an employee of the Union; the Union had no power to recommend, grant, or deny tenure to the plaintiff; and the JTA, not being the employer, does not have to provide a legitimate explanation for Dr. Byars' discharge.

In addition, union liability under 42 U.S.C. § 2000e–2(c)(3) is not premised on whether the union, through its officers and members, discriminated on the basis of gender-related bias, but whether its actions *caused* the *School District* to discriminate. On this motion, the School District is the proverbial "empty chair," since it has settled with the plaintiff. As a consequence, no evidence has been submitted as to whether the School Board's deci-

---

is that the Union's actions prompted her em- ployer, the District, not to grant her tenure.

sion not to grant tenure was even made on the basis of gender discrimination.

### 4. Prima Facie Case

█ Initially, the plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination by showing "(1) that [s]he belongs to a protected class; (2) that [s]he was performing [her] duties satisfactorily; (3) that [s]he was discharged; and (4) that [her] discharge occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in that class." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (citations omitted).

█ Dr. Byars asserts that she has established a prima facie case of discrimination because she is a member of a protected class (female); based on her formal performance evaluations and attestations by three former teachers, she has shown that she performed her duties satisfactorily; and that she was discharged from her position under circumstances giving rise to an inference of discrimination on the basis of her gender. Item 46, pp. 15–16. The "burden of establishing a prima facie case is not a heavy one. One might characterize it as minimal. . . . If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises." *Carlton v. Mystic Transp. Inc.*, 202 F.3d 129, 134 (2d Cir.2000) (citations omitted).

Certainly, the 1995 and 1996 performance evaluations indicate that District personnel considered Dr. Byars as having performed her duties satisfactorily as of the date of the latest evaluation, even recommending her for continued employment. Although the JTA argues that Dr. Byars was not performing her duties satisfactorily and that she cannot show that her discharge occurred in circumstances giving rise to an inference of discrimination, Item 50, pp. 8–9, the court finds that plaintiff

has met her minimal burden of establishing a prima facie case.

### 5. Defendant's Burden to Articulate a Legitimate, Non–Discriminatory Reason for Plaintiff's Termination

█ Although it charged that plaintiff did not establish a prima facie case, the JTA did not present its argument according to the *McDonnell Douglas* burden-shifting framework. It points to the decision not to grant tenure as one made by the District, not the Union, and notes that "under the circumstances, the District would have been derelict in its duties had it ignored the deteriorating situation at the high school in the autumn of 1996." Item 50, p. 10.

The court finds that, despite the inexact fit, the JTA has met its "burden" as well for articulating a legitimate reason for its opposition to Dr. Byars. While Dr. Byars pointed to instances of JTA members' actions and statements as part of their "three-year campaign to discredit [her] and ensure that she would not receive tenure," Item 46, p. 18, there was no official JTA statement opposing her leadership. The defendant refers to competent evidence-the NEA Report-which gives credence to the position held by some JTA members that the difficult atmosphere in the High School was due to Dr. Byars' leadership.

### 6. Does Plaintiff Carry her Burden on the Issue of Discriminatory Intent to Survive Defendant's Motion for Summary Judgment?

It is on this last point that plaintiff's opposition to defendant's motion for summary judgment hinges, and founders. Plaintiff's evidence was geared to show that Union members, some of whom were JTA officials, discriminated against Dr.

Byars because she was a woman, and clearly did not want her to be granted tenure. Plaintiff charges that the gender discrimination practiced by the Union members, together with the gender discrimination allegedly practiced by the School District, resulted in her discharge. The Amended Complaint charges that the Union worked with representatives of the District to deny plaintiff her right to be free from discrimination; that the Union approved and/or acquiesced in the individual (discriminatory) acts of its members; and that it discriminated against plaintiff because of her sex. *Id.,* ¶¶ 107, 109, 111. Plaintiff concludes that by causing and/or attempting to cause the District to discriminate against her, the Union should be held liable. The JTA argues that Dr. Byars has not provided enough legally sufficient evidence to raise an issue of material fact that the JTA (1) caused the District to discriminate against her, or that (2) the JTA itself discriminated against her on the basis of gender. The JTA concludes that given this dearth of evidence, no rational finder of fact could infer that Dr. Byars was, more likely than not, the victim of intentional discrimination. *Bickerstaff,* 196 F.3d at 447.

### a. Causation: Did the JTA Cause or Attempt to Cause the District to Discriminate Against Dr. Byars?

As evidence of the causal link between the Union's actions and the Board's termination of Dr. Byars required by section 2(c)(3), plaintiff charges that the NEA report was disseminated to the Board and was utilized in its ultimate determination not to grant tenure to Dr. Byars. Item 9, ¶ 39. While critical of the methods and conclusions reached, the Amended Complaint alleges neither that the NEA assessment was proposed nor that the Report was used for the explicit purpose of seeking Dr. Byars' termination.

The evidence plaintiff proffers regarding the Union–School Board causal link is, in this court's opinion, insufficient to withstand defendant's motion for summary judgment. Plaintiff provides no evidence to show that the actions of the Union, or Union members or officials, influenced the School Board and Superintendent to make their decision not to grant Dr. Byars tenure. *See Anjelino v. New York Times Company,* 200 F.3d 73, 95 (3d Cir.1999). Nor is there any evidence to show that the Board's ultimate decision was motivated by gender bias against Dr. Byars.

Even plaintiff's allegation that the NEA Report, published in December 1996, was instrumental in causing the Board to decline to hire Dr. Byars does not carry a great deal of weight. Both sides acknowledge that during the November 6, 1996 meeting with Dr. Byars, Superintendent King informed her that he would not recommend and the Board would not grant her tenure. This meeting took place over one month before the NEA Report was published. Further, *NEA* representatives authored the report, not the JTA. The Report, while admittedly pro-union and admittedly critical of Dr. Byars, does not contain any discriminatory references to her. There is no allegation that the JTA influenced those who investigated the problems at the High School and wrote the Report. Thus, Dr. Byars' reliance on the Report to show a causal link between the Union's actions and the decision by the School Board to deny her tenure is misplaced.

In her supporting affidavits, plaintiff attempts to show collusion between JTA members and District administrators, inferring that they were working closely together with the ultimate goal of seeking her dismissal. Item 48, Ex. D, ¶¶ 91–93. Teacher William Boerst, for example, ob-

served Mssrs. King and Coffman meeting "frequently in the halls of the high school" with teachers who were Union members, "openly planning strategy concerning Dr. Byars." Item 48, Ex. E, ¶ 33. However, Mr. Boerst provides no evidence in support of his conclusion. His speculation concerning the reason for these meetings is inadmissible.

### b. Union's discrimination

Even assuming that Dr. Byars had provided sufficient evidence to show the requisite causal link between the Union and the Board's decision to terminate her, Dr. Byars has failed to provide sufficient evidence to show that impermissible gender discrimination was the reason that the Union members behaved as they did. In her Amended Complaint (Item 9), Dr. Byars provides at least three direct allegations that would tend to show Union harassment (although not attributing that harassment to gender discrimination): 1) In paragraph 29, teacher Paul Warloski asked Union President Bruce Carpenter if there was a witch hunt against Byars, and Carpenter responded "Yes;" 2) In paragraph 41, Mr. Coffman told Dr. Byars he could not stop the Union's harassment of her; and 3) In paragraph 44, Mr. Carpenter was reported to have said to teacher Carolyn Whitehead, "About the conspiracy. Do I wish it hadn't happened? Yes. Could I have done anything about it? No."

However, the record provides no support for any of these statements, even though Mssrs. Carpenter and Coffman, Ms. Whitehead, and Dr. Byars were deposed. Another allegation in the amended complaint, found in paragraph 25, relates how David Mazzone, a High School teacher and Vice–President of the JTA, told fellow teacher Cynthia Peterson on November 7, 1996, "We got her. Byars. She's out. The JTA did it. And White-head, the way she yelled at me, I wrote her up. Whitehead will pay for what she said." However, when compared to the actual affidavit of Ms. Peterson, the text of Mr. Mazzone's statement is not as forthcoming, and critically so. He told Ms. Peterson, "Did you hear? We got 'er! We got 'er!" Item 48, Ex. F, ¶ 12. When she asked him what he meant, he responded, "Janita is gone. She got fired. She's not gonna be here any more!" *Id.*, ¶ 13. The affidavit goes on to say that by "we," Ms. Peterson understood Mr. Mazzone to mean the Jamestown Teachers' Association. *Id.*, ¶ 15. This statement on its face is ambiguous; and even if Mr. Mazzone was referring to the JTA, it does not attribute any legally impermissible motivation to "getting" her. Even providing the plaintiff with all favorable inferences, her effort to withstand summary judgment cannot rest on this statement.

Plaintiff mainly relies on the affidavits of three former teachers, Deborah J. Oram, William Boerst, and Cynthia C. Peterson, to defeat the motion for summary judgment.

### i. Deborah Oram's Affidavit

Ms. Oram became a full-time JHS Social Studies teacher in September 1994. Many of the statements and observations contained in her affidavit are generalizations which she does not support with specifics. For example, she asserts that "when Dr. Byars' hiring was announced, several of the 'old guard' teachers at the High School (both male and female) explicitly stated their opposition to the hiring of a woman principal, simply on the basis of her gender;" "As the years progressed, Mr. Von Reyn became unashamedly vocal in his opposition [to Dr. Byars], and used Dr. Byars' gender issue as ammunition in his arguments that Dr. Byars was not right for the school;" "I was aware of an

attitude of hostility that ran through virtually all of the JTA's dealings with Dr. Byars;" "I firmly believe that her gender and her sexual preference were significant factors in JTA's animosity toward her;" at faculty meetings, "often, she was disrespectfully attacked by JTA leaders;" "I believe that the Jamestown Teachers Association drove Dr. Byars out of the High School because the male leadership of the Union did not want to be under the direction of a woman." Item 48, Ex. D, ¶¶ 10, 18, 39, 40, 68, 97.

 While she supports her claims of anti-female bias on the part of male faculty and administration at the High School with a personal account of having resigned after being "passed over for a position ... in favor of a less-qualified male," *id.*, ¶ 72, this incident does not provide evidentiary support for the proposition that the JTA's actions toward Dr. Byars were motivated by gender bias. She also refers to a telephone conversation a student had overheard, where teacher and Union representative Jeffrey Keppel was reported saying "We got her. We've nailed her." *Id.*, ¶ 37. The student believed that Keppel was talking about Dr. Byars. *Id.*, ¶ 38. This statement, however, is inadmissible double hearsay, as well as ambiguous, since there is no evidence that Mr. Keppel was in fact talking about Dr. Byars or about her losing her position. In sum, Ms. Oram's affidavit provides no evidence in support of Dr. Byars' claims, as it consists of generalizations, hearsay, and recounting of anti-lesbian attitudes on the part of a number of teachers who were in the JTA leadership.

### ii. William Boerst's Affidavit

Mr. Boerst, a teacher in the Jamestown schools from 1967–2000, and a teacher at the High School during Dr. Byars' tenure there, described the longstanding friction between pro- and anti-JTA factions at the High School, and between the school administration and the JTA. He believed that the JTA's opposition to Dr. Byars was "intensified by the fact that she is a woman and a lesbian;" that "[t]he generally expressed feeling was that a man was needed to 'come in a[sic] take care of this stuff;'" "[t]he union leaders' and district administrators' common goal to remove Dr. Byars from her position brought them together; I would characterize their activities as collusive." Item 48, Ex. E, ¶¶ 16, 20, 36.

Like Ms. Oram, Mr. Boerst does not provide the kind of specific facts that would support the generalizations he makes. Also, like Ms. Oram, he provides a personal anecdote concerning an occasion where, as a member of the Shared Decision Making Team at the High School, he criticized the JTA's actions, particularly their treatment of Dr. Byars. As a consequence of his speaking out, he asserts that the JTA forced him to resign from the committee. *Id.*, ¶¶ 40–47. Again, while this might be indicative of the general climate at the High School and indicative of the hostility exhibited by the Union against those who would criticize it, and/or who were positively disposed to Dr. Byars, it does not lead to the conclusion that the JTA's actions toward Dr. Byars were based on gender discrimination.

### iii. Cynthia Peterson's Affidavit

The affidavit of Cynthia Peterson, a teacher in the Jamestown schools since 1972, and a teacher at JHS since 1988, also does not help Dr. Byars in her effort to avoid summary judgment. Ms. Peterson notes that when she spoke to the NEA assessor, she provided him with positive feedback concerning Dr. Byars, and told him that she thought the problems in the High School "resulted from hostility to Dr.

Byars on the part of many of the male teachers." Item 48, Ex. F, ¶ 36. She added that she felt betrayed because her comments were not taken into account in the NEA Report. *Id.*, ¶ 40. She also expressed her belief that "Dr. Byars' gender, and, to a lesser extent her sexual preference", caused these disaffected teachers, many of whom were in the JTA leadership, to be threatened and uncomfortable. *Id.*, ¶ 44. But then, she goes on to say,

> Although I cannot recall hearing any overt criticisms of Dr. Byars based on either her gender or her sexual preference from any individual Union leader, I was aware of a subtle undercurrent of hostility that ran through virtually all of the JTA's dealings with Dr. Byars, and I firmly believe that her gender and her sexual preference were significant factors in JTA's animosity toward her.

*Id.*, ¶ 45. She refers to meetings where Dr. Byars was attacked by JTA leaders. *Id.*, ¶ 46.

But here, too, Ms. Peterson's generalizations do not translate into specific instances. While she has made reference to an anti-female attitude on the part of some JTA teachers, her observations would not lead a rational factfinder to infer that the JTA members either exhibited anti-female bias or caused or attempted to cause the School Board to discriminate against Dr. Byars.

Considering all the legally admissible material in these three affidavits, even if it would be possible to find admissible incidents of gender animus expressed by JTA members, plaintiff did not submit any evidence that the Union played a meaningful role in the School Board's decision not to give tenure to Dr. Byars. There is ample evidence that numerous teachers who belonged to the JTA and who were officers of JTA were critical of

Dr. Byars. But there is flimsy evidence at best that those critical attitudes were based on gender discrimination. "Title VII does not insulate an individual from criticism that is not based on an impermissible reason." *Bickerstaff,* 196 F.3d at 451.

The Second Circuit has guided district courts confronted with the kind of amorphous atmosphere of hostility described herein when assessing material submitted in support of a plaintiff's discrimination claims. In *Bickerstaff,* the court noted, "[t]o satisfy Rule 56(e), affidavits must be based upon concrete particulars, not conclusory allegations." *Bickerstaff,* 196 F.3d at 451, citing *Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir.1997) (quotations and citations omitted). The problem with all three affidavits is that they provide a dearth of concrete particulars and admissible evidence. Other than Ms. Peterson's report of Mr. Mazzone's comments, and references to problems Ms. Oram and Mr. Boerst personally encountered which they attributed to their criticism of the JTA and support for Dr. Byars—which is irrelevant to Dr. Byars' claim—Dr. Byars has failed to offer a single act, statement, or admission by any JTA decision maker that would support Dr. Byars' allegation that the JTA either discriminated against her on the basis of gender, or that she was denied tenure because of the Union's role in causing or attempting to cause the Board to discriminate against her. The Second Circuit reminds us that while the comments to which Dr. Byars was subjected may have been rude, derogatory, and hostile, Title VII is not a "general civility code . . . ." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). While civility apparently did not reign at JHS, the incidents Dr. Byars has recounted do not rise

to a level where relief is warranted under Title VII.

Considered separately and cumulatively, these affidavits do not support a reasonable inference that the JTA, through its officers and members, harbored discriminatory bias. Plaintiff has also failed to provide evidence establishing a causal link between the Unions' alleged discriminatory bias and the School Board's decision not to grant tenure. Consequently, the court finds plaintiff's claim that the Union discriminated under Title VII insufficient to raise a question of material fact, and grants defendant's motion for summary judgment on plaintiff's Title VII and New York Executive Law gender discrimination claims.

## II. Conspiracy Pursuant to 42 U.S.C. § 1985(3)

### A. The Legal Standard

42 U.S.C. § 1985(3) provides in relevant part:

If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

■■■■ To establish a prima facie case under 42 U.S.C. § 1985(3), a plaintiff must demonstrate: (1) a conspiracy between defendants; (2) the intent to deprive plaintiff of the equal protection of the laws or the equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) a deprivation of plaintiff's rights. *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir.1999). The conspiracy must be motivated by some class-based invidious discriminatory animus behind the conspirators' action. *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993). Sexual orientation discrimination will not support a 42 U.S.C. § 1985(3) claim. *Trigg v. New York City Transit Authority*, 2001 WL 868336 (E.D.N.Y. July 26, 2001).

### B. Discussion

■■■■ Dr. Byars alleges that the "Union[,] by its members, officers, representatives and agents[,] conspired with officers, agents, representatives, and employees of defendant District to deprive [her] of the equal protection of the laws and of the equal privileges and immunities under the laws." Item 9, ¶ 119. The alleged conspiratorial acts against plaintiff were motivated because of her gender and sexual orientation. *Id.*, ¶ 121. Plaintiff complains that the Union and district "collud[ed] with respect to the mechanics of the process of the NEA assessment; selectively targeting teachers supportive of plaintiff for intimidation tactics and unfairly according teachers adversarial to plaintiff certain preferences and immunities, often at the expense of student welfare; blackballing plaintiff with the illegal and unethical dissemination of the NEA report; subverting the usual arms-length negotiations and procedures between the Union and the District; and programmatically harassing plaintiff in the performance of her job duties." *Id.*, ¶ 122. Conclusory allegations of the defendant's alleged participation in a conspiracy are inadequate to make out a claim under

§ 1985(3). *X–Men Security, Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). The plaintiff must allege sufficient facts to give rise to an inference that each of the four requisite elements is met. *Id.*

■■■ This claim is problematic for a number of reasons. Case law provides that Title VII employment discrimination claims are not properly pursued under 42 U.S.C. § 1985(3). *See Great American Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 378, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) ("[W]e conclude that § 1985(3) may not be invoked to redress violations of Title VII."); *Trigg,* 2001 WL 868336 at * 12; *True v. New York State Dept. of Correctional Services,* 613 F.Supp. 27, 32 (W.D.N.Y.1984).

In addition, with respect to the first element, "in order to prevail at trial the plaintiff must prove a mutual understanding or meeting of the minds to violate her civil rights." *Salgado v. City of New York,* 2001 WL 290051 (S.D.N.Y. Mar.26, 2001) (citation omitted). Because a section 1985(3) claim requires even more evidence than that necessary to successfully plead a Title VII violation, and given that Dr. Byars was unable to support her Title VII claim that the Union caused or attempted to cause the district to discriminate, she would not be able to show conspiracy under section 1985(3). *See Novotny,* 442 U.S. at 378, 99 S.Ct. 2345 ("It is true that a § 1985(3) remedy would not be coextensive with Title VII, since a plaintiff in an action under § 1985(3) must prove both a conspiracy and a group animus that Title VII does not require.") Also given the discussion, *supra,* on the Title VII claim and the finding that plaintiff did not provide enough legally sufficient evidence that would lead a reasonable trier of fact to conclude that the Union, through its officers and members, discriminated or caused the district to discriminate, the sec-

tion 1985(3) claim would also fail on the grounds that plaintiff is unable to satisfy the second element of her prima facie case. Thus, the court grants defendant's motion for summary judgment dismissing plaintiff's cause of action under 42 U.S.C. § 1985(3).

### III. State Law Claims

Dr. Byars has asserted New York State common law claims against the Union for tortious interference with contract, tortious interference with prospective economic advantage, and intentional infliction of emotional distress. Item 9, pp. 26–29.

As a result of the dismissal of plaintiff's federal claims against the JTA, this court will decline to exercise supplemental jurisdiction over her pendent state law claims. 28 U.S.C. § 1367(c)(3); *Tops Markets Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 102–03 (2d Cir.1998).

### CONCLUSION

For the reasons set forth above, the court grants defendant's motion for summary judgment. Item 44. This case is dismissed, and judgment shall enter for defendant Jamestown Teachers Association.

So ordered.